FILED

2025 May-28 PM 03:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | |
|---|---|
| **NORMAJEAN WEIDLEY**, *et al.*, )<br><br>     **Plaintiffs,** )<br><br>**v.** )<br><br>**AANIIIH NAKODA FINANCE**<br>**LLC**, *et al.*, )<br><br>     **Defendants.** ) | **Case No: 5:22-cv-905-LCB** |

<u>**MEMORANDUM OPINION**</u>

Aaniiih Nakoda Finance is a tribally owned online consumer lender that charged Plaintiffs—and other borrowers—interest rates as high as 700 percent, nearly thirty times the legal interest rate in Alabama. These absurd interest rates facially violate both Alabama law and foundational moral principles. First, the loans at issue here were illegal because they exceeded the rate allowed by Alabama law. Ala. Code § 5-18-15(a); *See* USURY, BLACK'S LAW DICTIONARY (12th ed. 2024) (defined as "[a]n illegally high rate of interest."). What's more, these rates far "exceed the proportion of the hazard run, or the want felt by the loan," which is, and always has been, "oppressive usury." 2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 456 (George Sharswood ed., 1893) (citation omitted).

But this case is not about the moral and policy arguments against usury. Instead, the Court must determine (1) whether certain components of—and

participants in—the tribal lending scheme are protected from suit by sovereign immunity, and (2) if they are not, whether Plaintiffs can sue them under Alabama's usury law and the federal racketeering statute.

After careful review of the parties' arguments, the Court finds that although Aaniiih Nakoda Finance (ANF) is shielded from suit by tribal sovereign immunity, the other Defendants are not entitled to the same immunity. The Court also finds it lacks subject matter jurisdiction over Plaintiff Normajean Weidley's state law claim against the Tribe's president, lacks personal jurisdiction to decide the state law tort and federal racketeering claims against the Tribal Officer Defendants, and that Plaintiffs have failed to state a claim for unjust enrichment against the BorrowWorks Defendants.

As a result, the Court **WILL GRANT** Aaniiih Nakoda Finance's motion to dismiss, Doc. 106, and **WILL GRANT IN PART** the motions to dismiss submitted by Jeffrey Stiffarm, Doc. 101, Tribal Officer Defendants, Doc. 107, and BorrowWorks defendants, Doc. 104.

I.    BACKGROUND

    A.    **The Tribal Lending Operation**

The Fort Belknap Indian Community of the Fort Belknap Reservation of Montana ("the Tribe") is "a federally recognized Indian tribal community comprising the Assiniboine (Nakoda) and Gros Ventre (Aaniiih) Tribes." Doc. 103

at 3; *see* 87 Fed. Reg. 4636-02 (listing federally recognized tribes). Although they have long histories, these two tribes have been on the Fort Belknap Reservation since the late 1880s. Barry M. Pritzker, "Chapter Six: The Great Plains," *A Native American Encyclopedia: History, Culture, and Peoples* 301, 319 (Oxford University Press, 2000).

If you take the Tribe's word for it, little has changed since then. Indeed, Tribe President Jeffrey Stiffarm recently testified before Congress that "[a]griculture remains the mainstay of our Reservation economy and virtually our sole industry." Testimony of Fort Belknap Pres. Jeffrey Stiffarm Before the Senate Committee on Indian Affairs, p. 3, July 12, 2023, https://perma.cc/5JM9-M638. But the limited discovery conducted in this case paints a different picture.

In search of "economic opportunity for the Tribe and its members," the Tribe began exploring the online consumer lending space as early as 2011. Doc. 103-1 at 2, 4. After several years of trial and error, the Tribe settled on a business strategy and established Aaniiih Nakoda Finance in 2017. *Id.* at 4. In doing so, the Tribe also built an Escherian corporate structure around ANF that gives the lender, the Tribe, and other companies in the corporate structure maximum liability protection.

Here's how it works: ANF is a "manager-managed" limited liability corporation formed under tribal law. Doc. 103-1 at 5. ANF is *managed* by the Fort Belknap Planning and Development Corporation, d/b/a Island Mountain

3

Development Group ("IMDG"), a tribal corporation under the control of the Tribe, which "coordinate[s] the Tribe's business planning and development activities." Doc. 103-2 at 2. ANF is technically *owned*, however, by GVA Holdings, Doc 103-1 at ¶ 13, another "manager-managed" tribal LLC that is, in turn, "wholly owned by the tribe and managed by" IMDG. Doc. 103-1 at 6.

In terms of its daily operations, ANF has no employees or assets of its own. Doc. 114-2 at 15.[1] Instead, IMDG loans employees to ANF, and those loaned employees "provide[] . . . services," including "management and oversight" to ANF through GVA Holdings and another tribal entity, Aaniiih Nakoda Servicing, LLC ("ANS"). *Id.* at 16. ANS is yet "another tribally-chartered, owned, and managed instrumentality of the" Tribe. Doc. 103-1 at 6. If this corporate structure leaves you wondering where the Tribe ends and these companies begin, you aren't alone—even ANF's corporate representative admits "there's not a lot of individual definition between" ANF, ANS, IMDG, and GVA. Doc. 114-2 at 16.

ANF also works with non-tribal vendors, BorrowWorks Decision Science, Inc. ("BorrowWorks") and BWDS, LLC, ("BWDS"), both defendants here. BorrowWorks is a Delaware corporation, and BWDS is a Delaware LLC, but both

---

[1] Defendants have filed numerous briefs and evidence under seal, including the Rule 30(b)(6) deposition cited here, conducted for purposes of jurisdictional discovery. But because some sealed information is necessary to resolve the pending motions, the Court will include some unredacted information in this Order where appropriate. The Court recognizes that the parties have privacy interests in the confidential information, but the public's interest in the reasoning behind the Court's Order is greater.

companies have their principal place of business in Fort Worth Texas. Doc. 104-1 at 3. Although the Tribe and its entities determine the terms and parameters for creditworthiness and loan eligibility, Doc. 114-2 at 17, the BorrowWorks Defendants "generate[] the loan documents," *id.*, and provide ANF with a "proprietary loan management system, underwriting management system technology that's customizable to [ANF's lending] program." Doc. 114-2 at 13. In short, this system gives ANF "the analytics" to determine whether a prospective borrower meets ANF's requirements. *Id.* at 19.

Despite the BorrowWorks Defendants' characterization of their involvement in ANF's lending operation as "merely . . . ministerial," Doc. 105 at 9, ANF's profit distribution points the other way. ANF distributes 51 percent of its profits to ANS, which passes those profits through to IMDG, its manager, which passes a percentage of its net income to the Tribe. Doc. 114-2 at 16-17. But BorrowWorks gets the remaining 49 percent of ANF's profits. *Id.* at 16.

### B.    ANF's Loans to Weidley and Okrzesik

That brings us to this case. On November 5, 2020, Plaintiff Normajean Weidley took out an online loan of $700 from ANF, doing business as Bright Lending. Doc. 130-1 at 1. The loan agreement stated that the annual rate of interest on the loan was 699.9985 percent, amounting to a pre-calculated finance charge of $3,086.94. Doc. 103-9 at 10. Weidley paid off $344.48 of her balance but stopped

making payments after November 27, 2020. Doc. 130-1 at 1. Fifteen days later, ANF stopped trying to collect on the loan, *id.* at 2, and it "waived, eliminated, and forgave" the loan in July 2022. *Id.*

Plaintiff Ellen Okrzesik took out a $500 loan from Bright Lending on October 15, 2021. Doc. 103-10 at 7. Like Weidley, ANF charged Okrzesik an interest rate of 699.8918 percent, for a total precalculated finance charge of $2,325.50. *Id.* Five days later, Okrzesik paid off the loan early, paying a total balance of $548.07. Doc. 130-1 at 2.

The next day, Okrzesik took out another loan of $600 from ANF. This time, ANF generously charged her just 599.9961 percent interest, for a total cost of $2,187.93. Doc. 103-11 at 7. Okrzesik only "made two payments on that loan[,] totaling $253.60," and stopped after November 12, 2021. Doc. 130-1 at 2. Just as with Weidley's loan, ANF gave up on collection efforts after December 30, 2021, and "waived, eliminated, and forgave" the loan in July 2022. *Id.* at 1.

### C.    Procedural History

In June 2022—a month before ANF discharged her debt—Weidley sued ANF, BWDS LLC, and Benjamin Gatzke (BWDS's CEO) and in the circuit court of Madison County, Alabama on behalf of herself and other borrowers, alleging that ANF charged illegally high interest rates in violation of the Alabama Small Loans Act ("ASLA"), Ala. Code § 5-18-1, *et seq*. Doc. 1 at 15-16, 31-32. A month later,

ANF removed the case to federal court under the Class Action Fairness Act, 28 U.S.C. § 1446. *Id.* at 1. Weidley did not object to removal and filed an amended complaint in September 2022. Doc. 19. In January 2023, the Court allowed Weidley to conduct limited jurisdictional discovery. Doc. 63. After Weidley deposed ANF's corporate representative, she filed a Second Amended Complaint ("SAC") in June 2023. Doc. 83. Weidley filed an unredacted version of the SAC under seal ten days later, which is the docket entry cited in this opinion. Doc. 95.

The SAC added BorrowWorks Decision Science, Inc., Evan Azure, Geno Levaldo, Derek Azure, Brian Wing, Curtin Horn, and Jeffrey Stiffarm as defendants, and added Ellen Okrzesik as a plaintiff. *See id.* at 1. In relevant part, the SAC alleges that ANF "extends high-interest predatory loans" in Alabama—"including the subject loans made to the Plaintiffs and the class members"—without a license, and in violation of Alabama law. Doc. 95 at 3, 5. The SAC also alleges that the funding, operation, and management of ANF's lending business "is conducted" at least partially "through others, including non-tribal individuals and entities located outside of any tribal land." *Id.* at 9. The SAC also incorporates new state law tort claims and claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq. Id.* at 23-24.

In response, Defendants moved to dismiss the complaint on various grounds, including lack of subject matter and personal jurisdiction, failure to state a claim,

and failure to join a necessary party. *See* FED. R. CIV. P. 12(b)(1), (2), (6), (7). The Court now considers those motions in turn.

## II.    DISCUSSION

### A. Personal Jurisdiction

The Court begins, as it must, by addressing "issues relating to personal jurisdiction before reaching the merits of . . . plaintiff[s'] claims." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997). Although courts can exercise either general[2] or specific personal jurisdiction, Plaintiffs only assert specific personal jurisdiction. Doc. 138 at 11 n.5. Courts have specific personal jurisdiction over claims that "aris[e] 'out of a party's [specific] activities in the forum state [and] are related to the cause of action alleged in the complaint.'" *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007) (quoting *McGow v. McCurry*, 412 F.3d 1207, 1214 n.3 (11th Cir. 2005) (internal quotation marks omitted)). And because "[s]pecific jurisdiction is claim-specific," plaintiffs must demonstrate personal jurisdiction for each claim and defendant. *Argos Glob. Partner Servs., LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1086 (S.D. Fla. 2020).

---

[2]    The exercise of general personal jurisdiction requires a showing that the defendant has "continuous and systematic . . . contacts" with the forum State. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

### 1.    Legal Standard

To establish personal jurisdiction over a nonresident defendant, a plaintiff must "alleg[e] in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). Plaintiffs bear the initial jurisdictional burden, and a defendant can "challenge[] personal jurisdiction 'by submitting affidavit evidence in support of its position.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (quoting *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (internal quotation marks omitted)).

A defendant cannot rebut personal jurisdiction by offering "conclusory assertions that the defendant is not subject to [personal] jurisdiction." *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006). Rather, a defendant's affidavit must "contain specific factual declarations within the affiant's personal knowledge" *Louis Vuitton*, 736 F.3d at 1351 (internal quotation marks omitted). Then and only then does the burden "shift[] back to the plaintiff to produce evidence supporting jurisdiction." *Id.* at 1350. In such cases, to the extent the affidavits disagree, courts "must [still] construe all reasonable inferences in favor of the plaintiff." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990).

### 2.    FBIC President Jeffrey Stiffarm

This Court has personal jurisdiction over both the state law and *Ex Parte Young* or official capacity claims against President Stiffarm. The Court has personal jurisdiction over the ASLA claim against President Stiffarm because Plaintiffs have plausibly alleged that he "(1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." *Moore v. Cecil*, 109 F.4th 1352, 1362 (11th Cir. 2024) (quoting *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 n.28 (11th Cir. 2009)) (internal quotation marks omitted). And the Court has personal jurisdiction over the claim against President Stiffarm in his official capacity because Plaintiffs have alleged (and Stiffarm has not rebutted) that ANF is engaged in an ongoing violation of state law.

### a)    *The exercise of personal jurisdiction over President Stiffarm is proper as to the state law claim.*

Before a court can "exercise personal jurisdiction over" a defendant, "an applicable statute must first confer personal jurisdiction. Then, the court must determine that the exercise of jurisdiction comports with" the Fourteenth Amendment's due process requirements. *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021) (cleaned up). Those "two inquiries merge" for the Plaintiffs' state law claim against President Stiffarm, "because Alabama's long-

arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible." *Moore*, 109 F.4th at 1362 (citations omitted).[3]

Stiffarm, a resident of Montana, adopts the arguments of the other nonresident Tribal Officer Defendants on this issue. Doc. 102 at 5. Applying that framework, Stiffarm's argument is that there is no personal jurisdiction because he lacks sufficient personal contacts with Alabama, since he was "not even affiliated with IMDG or ANF at the time the Plaintiffs were allegedly injured." Doc. 107-1 at 12. According to Plaintiffs, however, these requirements are satisfied because they have plausibly alleged that Stiffarm committed an intentional tort when he violated the Alabama Small Loans Act. The Court agrees.

In relevant part, ASLA bars lenders from (1) issuing loans under $1,500 without a license, Ala. Code § 5-18-4(a),[4] or (2) charging more than 24 percent

---

[3] Alabama's long-arm statute reads:

> An appropriate basis exists for service of process outside of this state upon a person or entity in any action in this state when the person or entity has such contacts with this state that the prosecution of the action against the person or entity in this state is not inconsistent with the constitution of this state or the Constitution of the United States.

ALA. R. CIV. P. 4.2(b).

[4] The full text of ASLA's licensing requirement reads:

> No person shall engage in the business of lending in amounts of less than one thousand five hundred dollars ($1,500) and contract for, exact or receive, directly or indirectly, on or in connection with any such loan, any charges whether for interest, insurance, compensation, consideration, or expense, which in the aggregate are greater than the interest that the lender would be permitted by law to charge for a loan of money if he or she were not a licensee under this chapter, except as provided in and authorized by this chapter and without first having obtained a license from the supervisor.

ALA. CODE § 5-18-4(a).

interest on loans between $200 and $1,500. ALA. CODE § 5-18-15(a). Plaintiffs allege that President Stiffarm violated these provisions because he "had general supervisory control over [ANF's] lending activities, including the illegal loans extended in Alabama" as the Tribe's president. Doc. 95 at 5. Although the parties conducted jurisdictional discovery in this case, Plaintiffs do not say more about President Stiffarm's involvement with ANF's lending operation.

Even so, Plaintiffs have pled well enough to establish personal jurisdiction over President Stiffarm. Most other courts to consider this issue have construed violations of state lending law as intentional torts for personal jurisdictional purposes. *See, e.g.*, *Duggan v. Martorello*, 596 F. Supp. 3d 158, 176 (D. Mass. 2022); *Smith v. Martorello*, 2021 WL 1257941, at *8 (D. Or.), *report and recommendation adopted as modified*, 2021 WL 981491 (D. Or.); *Gingras v. Rosette*, 2016 WL 2932163, at *11 (D. Vt.), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019). Thus, Stiffarm "is alleged to have committed an intentional tort against" the Plaintiffs by overseeing the issuance of an unlicensed small loan and the charge of excessive interest on that loan. *Licciardello v. Lovelady*, 544 F.3d 1280, 1287 (11th Cir. 2008).

Given that Plaintiffs have alleged Stiffarm committed an intentional tort, "[t]he proper focus of the 'minimum contacts' inquiry . . . is the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 291

12

(2014) (cleaned up). To best assess that relationship, courts apply the effects test laid out in *Calder v. Jones*, 465 U.S. 783 (1984), which "requires a showing that the defendant (1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." Moore, 109 F.4th at 1362.

Plaintiffs' allegations satisfy the effects test. Taking them as true, the whole lending process, from solicitation of the loan through disbursal, was "not negligent, but intentional," for the purpose of illicit "commercial gain." *Licciardello*, 544 F.3d at 1287-88. Such "allegations satisfy the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum." *Id.* at 1288.

It's not enough to simply declare that personal jurisdiction is lacking—at a minimum, Stiffarm needed to submit an affidavit "contain[ing] specific factual declarations within [his] personal knowledge" to rebut Plaintiffs' assertion of personal jurisdiction. *Louis Vuitton*, 736 F.3d at 1351. But Stiffarm merely "incorporate[d] by reference the" personal jurisdiction arguments "raised and briefed by [the] Tribal Defendants," and did not offer an affidavit to contradict the Plaintiffs' assertion of personal jurisdiction. Doc. 102 at 5. Indeed, the *only* support Stiffarm offers is that he was elected on November 5, 2021. *Id.* at 4 (citing Bureau

of Indian Affairs, Tribal Leadership Directory, https://perma.cc/T6RU-PEQX).[5] But the record stops there—Stiffarm doesn't point out that the Tribe's constitution requires that newly elected presidents take "office immediately upon *certification* of the election results," FBIC Const. Art. VII, § 2 (emphasis added), and he offers no evidence of the date he took office or how long certification took. Because Stiffarm has left unrebutted the plausible allegation that his "intentional conduct in his state of residence was calculated to cause injury to" Plaintiffs in Alabama, Stiffarm "cannot now claim surprise at being haled into court here." *Licciardello*, 544 F.3d at 1288.[6]

For the same reasons, the exercise of personal jurisdiction satisfies due process. The Fourteenth Amendment demands that a "defendant have 'fair warning' that a particular activity may subject him to the jurisdiction of a foreign sovereign." Due process "is satisfied" if, as here, "the defendant has purposefully directed his activities at the forum, and the injuries in question arise from or relate to the defendant's activities that were aimed at the forum state." *Madara*, 916 F.2d at 1516.

---

[5] The link Stiffarm provided was dead at the time this opinion was issued. The Court has provided a replacement link.
[6] To be sure, Weidley made no payments on her loan after November 2020, well before Stiffarm took office, but Stiffarm has not provided sufficient evidence to defeat personal jurisdiction on Weidley's claim at this stage of litigation. And even if Stiffarm had met his burden to show that the Court lacks personal jurisdiction concerning *Weidley's* ASLA claim, that would not "preclude [Weidley] from recovering as [a] class member[,] if a class is certified and if" she "qualif[ies] as [a] member[]." *Lee v. Branch Banking & Tr. Co.*, 2018 WL 5633995, at *4 n.1 (S.D. Fla. Oct. 31, 2018). As the Court later explains, however, the timing question is significant to the Court's standing analysis. *See infra* Section V.A.1.

Thus, the exercise of personal jurisdiction over Plaintiffs' state law claims against Stiffarm is proper.

>    *b)*    ***The exercise of personal jurisdiction over President Stiffarm is proper as to the official capacity claim.***

Because the Plaintiffs have plausibly alleged that the Tribe is engaged in an ongoing violation of Alabama's lending law, the Court also has proper personal jurisdiction over Stiffarm for purposes of the Plaintiffs' claim for injunctive relief. As the Court will explain, *infra* Section IV.B.2, "tribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1290 (11th Cir. 2015).

In Count IV, Plaintiffs allege that Stiffarm "supervise[s] and direct[s] the" ANF's unlawful "lending activities" in Alabama in his official capacity as president of the Tribe. Doc. 95 at 23. The logic is straightforward—Stiffarm leads the Tribe, and the Tribe owns and manages IMDG, which "is the *de facto* manager of ANF and responsible for the illegal lending operations of ANF in Alabama," including decisions about "which states ANF will lend money into, the amounts of those loans and the rates of interest for those loans." *Id.* at 22-23. As a result, Plaintiffs seek to prospectively enjoin Stiffarm in his official capacity "from collecting or servicing the illegal loans, and from making any loans in the future in the State of Alabama in violation of Alabama law." *Id.* at 25. And as with Plaintiffs' ASLA claim, Stiffarm

has failed to rebut the allegation that he is supervising and directing an ongoing violation of Alabama law.

**B.  The exercise of personal jurisdiction over the Tribal Officer Defendants is proper only as to Plaintiffs' claim for injunctive relief.**

The Court next considers whether it can exercise personal jurisdiction over Defendants Bryan Wing, Curtis Horn, Derek Azure, Steve Fox, Geno Levaldo, and Evan Azure ("Tribal Officer Defendants"). Although plaintiffs must demonstrate personal jurisdiction for each claim and defendant, *Ciuchini*, 446 F. Supp. 3d at 1086, these Defendants can be put into three buckets:

1)  Bryan Wing, Curtis Horn, Derek Azure, and Steve Fox are FBIC members and members of FBIC elected leadership council. They were each appointed to ANF's board by that elected leadership council on January 19, 2023, and were "not affiliated with IMDG" before that date. Docs. 108-10, 112.

2)  Geno Levaldo is the chairman of IMDG's board of directors, and an elected tribal leader. Doc. 111. He was also appointed to the board by the FBIC leadership council on January 19, 2023, and had no prior affiliation with IMDG before that date, but he does not state when he became chairman of the Board. *Id.*

3)  Evan Azure is IMDG's CEO and a tribal member. Doc. 113. He was appointed as IMDG's CEO by its board of directors on April 6, 2023. *Id.* Azure does *not* disclaim prior affiliation with IMDG, but there's no evidence in the record to that effect, and Plaintiffs have not alleged that Azure had any prior involvement.

1.  **The Court lacks personal jurisdiction over the RICO claim against Tribal Officer Defendants because the claim is implausible.**

The starting point for the Court's personal jurisdiction analysis is Plaintiffs' claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* That's because "[w]hen a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997). And under the doctrine of pendent personal jurisdiction, RICO's nationwide service provision allows courts "to exercise personal jurisdiction over" additional federal and "state law claims . . . aris[ing] from the same set of facts, without engaging in the traditional personal jurisdiction analysis." *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1212 (S.D. Fla. 2021) (collecting cases). In other words, so long as the underlying RICO claim is not "insubstantial, implausible, foreclosed by prior decisions of this Court, or" meritless, courts have personal jurisdiction over that claim and all related claims. *Republic of Panama*, 119 F.3d at 941.

Although pendent *personal* jurisdiction "must be properly understood to be a federal common law doctrine" unrelated to supplemental *subject matter* jurisdiction under 28 U.S.C. § 1367, the practical implication of the doctrine in the RICO context is that personal and subject matter jurisdiction are intertwined. Wright & Miller,

Application of Modern Jurisdictional Principles—Pendent Personal Jurisdiction, 4A Fed. Prac. & Proc. Civ. § 1069.7 (4th ed.). For that reason, Plaintiffs' RICO claim "must survive a 12(b)(6) analysis if it is to serve as the basis for the Court's personal jurisdiction over Plaintiffs' remaining state law claims." *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1232 (S.D. Fla. 2017).

With that in mind, the Court turns to the Tribal Officer Defendants' Rule 12(b)(6) motion. On this point, the Tribal Officer Defendants argue that Plaintiffs have failed to state a claim because they weren't in office until 2023, long after Plaintiffs' loans were closed out. The Court agrees.

The Rule 12(b)(6) standard demands that "a complaint must plead enough facts to state a claim to relief that is plausible on its face." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347-48 (11th Cir. 2016) (internal quotations marks omitted). RICO "provides a cause of action for '[a]ny person injured in his business or property by reason of a violation of section 1962.'" *Id.* at 1349 (quoting 18 U.S.C. § 1964(c)). But it's not enough to merely allege that a defendant violated the Act—"[r]ather, pleading a civil RICO claim requires that plaintiffs plead facts sufficient to give rise to a reasonable inference that the claimed" violation "was the but-for and proximate cause of the plaintiffs' injuries." *Id.* In other words, "[t]he connection between the" alleged RICO violation "and the injury can be neither remote, purely contingent, nor indirect." *Id.*

Plaintiffs' RICO claim against Tribal Officer Defendants cannot survive this standard. Count V of the SAC alleges that the Tribal Officer Defendants violated RICO's "unlawful debt" provision, which criminalizes the "collection of unlawful debt" by "any person employed by or associated with any enterprise engaged in" or affecting "interstate or foreign commerce." 18 U.S.C. § 1962(c). The statute defines "unlawful debt" as "debt . . . incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." § 1961(6). To be sure, ANF's rates are multiple times greater than RICO's threshold for "unlawful debt," since Alabama law sets the maximum interest rate on the loans at issue here at 24 percent. ALA. CODE § 5-18-15(a).

Even so, that's not enough to make the Tribal Officer Defendants liable here. The RICO claim is brought against Defendants in their individual capacity. Doc. 95 at 23. And in this circuit, RICO's standing requirements "include a requirement that the party's injuries be the direct result of the alleged racketeering activity. Therefore, a plaintiff has RICO standing only if his injuries were proximately caused by the RICO violation." *Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 906 (11th Cir. 1998); *see Pelletier v. Zweifel*, 921 F.2d 1465, 1499 (11th Cir.1991) (holding that a plaintiff has RICO standing only if "his injury flowed directly from the commission of the predicate acts").

19

Put simply, there's no possible causation here. Weidley made her last payment to ANF on November 27, 2020, and Okrzesik's last payment was November 12, 2021. Doc. 130-1. But Defendants Wing, Horn, Azure, Fox, and Levaldo did not join the board until January 19, 2023, Docs. 108-12, and Defendant Evan Azure was not appointed IMDG CEO until April 6, 2023. Doc. 113. These Defendants cannot have injured the Plaintiffs by "collecting" unlawful debt, because they were not employed by ANF when it collected Plaintiffs' payments. Even assuming that attempts to collect debt count as "collection" for RICO purposes, ANF stopped trying to collect from Weidley and Okrzesik in December 2020 and December 2021, respectively. Doc. 130-1.

As a result, the Complaint "does not adequately plead that the plaintiffs suffered injury as a result of" the Tribal Officer Defendant's participation in ANF's alleged illegal activity, and this Court lacks personal and subject matter jurisdiction over the RICO claim against them. *Ray*, 836 F.3d at 1349.

### 2. The Court lacks personal jurisdiction over the state law claims against the Tribal Officer Defendants.

For the same reasons, this Court lacks personal jurisdiction over the state law claims against the Tribal Officer Defendants. Count I (ASLA) and Count II (conspiracy) are brought against the Tribal Officer Defendants in their individual capacities. Doc. 95 at 20-22. And personal "[j]urisdiction is proper where the defendant's contacts with the forum proximately result from actions *by the defendant*

20

*himself* that create a 'substantial connection' with the forum state." *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990) (cleaned up & emphasis added). But as already explained, the Tribal Officer Defendants were not employed by or affiliated with ANF at the time it solicited, underwrote, issued, or collected on the loans issued to Weidley and Okrzesik, nor could they have conspired to violate Alabama law through those activities.

### 3. The exercise of personal jurisdiction over the Tribal Officer Defendants is proper as to the claim for injunctive relief.

Plaintiffs allege in Count IV that the Tribal Officer Defendants "supervise and direct" ANF's unlawful "lending activities" in Alabama in their official capacity as "leaders, officers and board members of IMDG and the Fort Belknap Indian Community." Doc. 95 at 23. As a result, Plaintiffs seek to prospectively enjoin the Tribal Officer Defendants in their official capacities "from collecting or servicing the illegal loans, and from making any loans in the future in the State of Alabama in violation of Alabama law." *Id.* at 25.

The inquiry is complicated because "[p]ersonal jurisdiction over state or tribal officials in an *Ex parte Young* case raises special issues in 'minimum contacts' analysis." *Gingras*, 2016 WL 2932163, at *8. The relevant question is ultimately "whether due process permits a [federal] court in" Alabama "to exercise jurisdiction over" an out-of-state tribal official who is alleged to have acted through the Tribe (or an arm of the tribe) in violation of Alabama law. *Great W. United Corp. v.*

*Kidwell*, 577 F.2d 1256, 1266 (5th Cir. 1978), *rev'd on other grounds, Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979). Put differently, should courts look to the "minimum contacts" of the *tribe* or the *individual* to determine personal jurisdiction in *Ex parte Young* cases? Lower courts are divided on this question. *See Gingras*, 2016 WL 2932163, at *9 (collecting cases).

Although the *Gingras* decision shares some factual similarities with this case, it's legal conclusion on personal jurisdiction is inapt. In *Gingras*, plaintiffs sued a tribal lender and other defendants, including the lender's CEO and two members of its board of directors, in a Vermont federal court. *Id.* at *2. Like Plaintiffs here, the *Gingras* plaintiffs did not "claim that the Tribal Defendants ever visited" the forum state, "or communicated with anyone in" the forum state. *Id.* at *9. Instead, the Gingras plaintiffs claimed that the tribal lender's "contacts with Vermont" were enough—the lender "operated a website which advertised loans across the United States," and sent the plaintiffs "a series of emails and a loan application"; after "approval of the loan," the lender "transferred the loan principal to [plaintiffs'] bank accounts in Vermont." *Id.* The *Gingras* court acknowledged that "[t]hese frequent contacts would have been sufficient to subject" the tribal lender "to personal jurisdiction in Vermont," but concluded that the lender's "contacts with" the forum state could not be "vicariously attributed to its officials any more than directors of a

corporation are subject to suit personally in any forum where the actions of the corporation satisfy the minimum contacts test." *Id.*

This Court reaches the opposite conclusion: personal jurisdiction over the Tribal Officer Defendants is proper—at least as to Count IV—because the *Tribe's* contacts with Alabama satisfy the minimum contacts requirement for personal jurisdiction. That conclusion is compelled by the logical implications of the Supreme Court's decision in *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014). In *Bay Mills*, the Court held that "tribal sovereign immunity bar[red] Michigan's suit against the Bay Mills Indian Community for opening a casino outside Indian lands" because "Congress has not abrogated tribal sovereign immunity from a State's suit to enjoin gaming off a reservation or other Indian lands." *Id.* at 785.

But *Bay Mills* did not wholly defang states seeking to enforce their laws. "[A]nalogizing to *Ex parte Young*," the Court also held that because individual "'Indians going beyond reservation boundaries' are subject to any generally applicable state law," a state "could bring suit against tribal officials or employees (rather than the Tribe itself) *seeking an injunction*." *Id.* at 796 (citation omitted & emphasis added). That's because "tribal immunity does not bar such a suit for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct." *Id.*

Although *Bay Mills* did not consider the issue of personal jurisdiction, its logic is clear: if states can "quickly and permanently [shutter] an illegal casino" by suing the individual "tribal officials and employees" who run it, *id.*, the relevant activity—at least for sovereign immunity purposes—is the casino's activity, not the tribal officers' activity. To be sure, Alabama is not a plaintiff here. But that's not a good enough reason to put daylight between *Bay Mill*'s sovereign immunity analysis and the Court's personal jurisdiction analysis here—ANF issued (and continues to issue) loans that violate Alabama law, and Alabama has provided its citizens with a cause of action to enforce that law. Requiring plaintiffs to show that tribal officials and employees sued in their *official* capacity are also *personally* responsible for the Tribe's violations of state law would set too high a bar in front of litigants seeking only "to enforce [Alabama] law on [Alabama] lands." *Id.* As a result, the Court has personal jurisdiction to decide the claim against Tribal Officer Defendants in their official capacity.

### C.     The exercise of personal jurisdiction over the BorrowWorks Defendants is proper under RICO's nationwide service provision.

Because Plaintiffs have plausibly stated a claim that the BorrowWorks Defendants violated RICO's illegal lending provision, RICO's national service provision was triggered, which makes personal jurisdiction proper. FED. R. CIV. P. 4(k)(1).

24

As discussed above, *supra* Section III.B.1, RICO's nationwide service provision gives the Court pendent personal jurisdiction over all related claims, so long as Plaintiffs have adequately stated a RICO claim. Thus, Plaintiffs' RICO claim against the BorrowWorks Defendants "must survive a 12(b)(6) analysis if it is to serve as the basis for the Court's personal jurisdiction over Plaintiffs' remaining state law claims." *Leon*, 301 F. Supp. 3d at 1232.[7] The BorrowWorks Defendants argue that the RICO claims against them should be dismissed because Plaintiffs have alleged nothing more than "participation" in the tribal lending enterprise, and that Plaintiffs failed to make specific allegations against each individual defendant.

To establish a violation of § 1962(c), Plaintiffs must adequately plead that the BorrowWorks defendants were "individually . . . associated with an[] enterprise engaged in . . . interstate or foreign commerce," and "conduct[ed] or participate[d,] directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). It's true that "'[m]ere participation in the activity of [an] enterprise is insufficient' to impose liability under Section 1962." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Instead, "to conduct or participate, directly or indirectly, in the conduct of such

---

[7] The Court did not consider any jurisdictional discovery submitted by the parties in deciding the Defendants' Rule 12(b)(6) motions, because consideration of evidence outside the four corners of the Complaint converts a Rule (12)(b)(6) motion to a Rule 56 summary judgment motion. FED. R. CIV. P. 12(d); *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982).

enterprise's affairs," § 1962(c) requires a defendant to "participate in the operation or management of the enterprise itself." *Id.* at 185.[8]

In any event, Plaintiffs have adequately pled a RICO claim against Tribal Officer Defendants. The SAC alleges that

> Gatzke, on behalf of Borrow[W]orks and BWDS, working with [ANF employees], participated in the decisions on how to structure ANF, which loan documents to use, which states to lend into, what interest rates to charge, how to capitalize the lending operations, how to market into each state, how to divide the profits of the enterprise, how to mechanically deliver loan proceeds and collect payments, provide for the loans, collect the payments as well as decisions as to the size of the loans, interest rates and the decision not to obtain licensing required by Alabama law.

Doc. 95 at 23. Plaintiffs also allege that the BorrowWorks Defendants "engaged in the collection and retention of unlawful debt by directly or indirectly conducting the affairs of Bright Lending." *Id.* at 23-24.

Although Defendant Benjamin Gatzke—CEO of both BorrowWorks corporate defendants—submitted an affidavit that purports to rebut these allegations, it comes nowhere close. Gatzke states that

> [n]either BorrowWorks nor BWDS engage in the business of making consumer loans, and therefore, neither company has ever advertised

---

[8] As the *Reves* Court noted,

> the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. The "operation or management" test expresses this requirement in a formulation that is easy to apply.

*Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

consumer loans products, (b) offered consumer loan products, (c) been
a counterparty on consumer loan products, including as to Plaintiffs, or
(d) collected debts owed on consumer loan products on behalf of
BorrowWorks or BWDS.

Doc. 104-1. But that says nothing about Plaintiffs' allegation that the BorrowWorks

Defendants are integral to ANF's lending business. *See Gibbs v. Haynes Invs., LLC*,

368 F. Supp. 3d 901, 909 (E.D. Va. 2019), *aff'd*, 967 F.3d 332 (4th Cir. 2020)

(holding that RICO's "operation or management" test was satisfied where a

"designated non-tribal entity provided the infrastructure to run the lending

operations.").

As a result, Plaintiffs' claim against the BorrowWorks Defendants under

§1962(c) states a plausible claim for relief, and service under RICO's nationwide

service provision was proper. § 1965(c). Additionally, the BorrowWorks Defendants

have not "demonstrated any constitutionally significant inconvenience," and the

Court "find[s] no infringement of their individual liberty interests protected by the

Due Process Clause of the Fifth Amendment." *Republic of Panama*, 119 F.3d at 948.

For these reasons, the Court has personal jurisdiction over the RICO claim

against the BorrowWorks Defendants, and pendent personal jurisdiction over all

other claims against them.

### D.    ANF has waived the issue of personal jurisdiction.

ANF did not contest personal jurisdiction, so the Court can proceed straight

to the issue of tribal sovereign immunity. *Ins. Corp. of Ireland v. Compagnie des*

*Bauxites de Guinee*, 456 U.S. 694, 703 (1982) (holding that "[b]ecause the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived").

## III.    TRIBAL SOVEREIGN IMMUNITY

As "domestic dependent nations that exercise inherent sovereign authority over their members and territories . . . Indian tribes [] possess the common-law immunity from suit traditionally enjoyed by sovereign powers." *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1287 (11th Cir. 2015) (cleaned up). That immunity shields Indian tribes from lawsuits "unless the tribe clearly waived its immunity or Congress expressly abrogated that immunity by authorizing the suit." *Id.* And like personal jurisdiction, the issue of tribal sovereign immunity must also be considered "on a claim-by-claim and defendant-by-defendant basis." *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 887 (11th Cir. 2024).

### A.    ANF is entitled to sovereign immunity as an arm of the Tribe.

In this circuit, "an entity that functions as an arm of a tribe shares in the tribe's immunity." *PCI Gaming Auth.*, 801 F.3d at 1288 (collecting cases). No party disputes that ANF is an arm of the tribe; instead, the relevant question is whether there's been any waiver of the Tribe or ANF's tribal sovereign immunity. Because neither the Tribe nor Congress has waived that immunity here, the Court will dismiss the Plaintiffs' ASLA claim against ANF.

28

Congress has not waived the Tribe's immunity here, foreclosing the first avenue. The second avenue—tribal waiver—is no more promising, since ANF included a provision in its loan agreements expressly preserving its sovereign immunity. *See* Docs. 103-9 at 12; 103-10 at 9; 103-11 at 9. To be sure—as Plaintiffs point out—"[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148-49 (1973).

But tribal members are not the tribe itself, and "'waivers of tribal sovereign immunity cannot be implied on the basis of a tribe's actions, but must be unequivocally expressed.'" *Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1235 (11th Cir. 2012) (quoting *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1286 (11th Cir. 2001)). Further, "whether [ANF] is subject to a statute and whether [ANF] may be sued for violating the statute are two entirely different questions," with two entirely different answers. *Williams v. Poarch Band of Creek Indians*, 839 F.3d 1312, 1323 (11th Cir. 2016).

Put simply, "[t]here is a difference between the right to demand" a tribe's "compliance with state laws and the means available to enforce" those same state laws against the tribe. *Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 755 (1998). Here, the "razor-thin" difference between ANF's subjection to ASLA

29

and Plaintiffs' "right to commence a suit demanding compliance with (or damages for violations of)" ASLA is an unbridgeable chasm. *Williams*, 839 F.3d at 1324. Because ANF shares the Tribe's unwaived immunity, ANF is both "subject to" ASLA's requirements and immune from Plaintiffs' lawsuit for violating those requirements.[9] *Id.*

## B.    Defendant Jeffrey Stiffarm is not entitled to sovereign, qualified, or legislative immunity.

### 1.    Sovereign immunity does not shield Stiffarm from the ASLA claim in Count I.

Stiffarm is not entitled to sovereign immunity on Count I because tribal officers may be sued in their individual capacities for off-reservation conduct, so long as the real party in interest is not the Tribe. *Lewis v. Clarke*, 581 U.S. 155, 163 (2017). The Court is "cognizant of the . . . concern that plaintiffs not circumvent tribal sovereign immunity." *Id.* Even so, "that immunity is simply not in play" here because Stiffarm, not the Tribe, "is the real party in interest"—Count I contains a state law tort claim against President Stiffarm individually for conduct in Alabama, and any judgment against him would "not require action by the sovereign or disturb the sovereign's property." *Id.*

---

[9] Admittedly, this strange outcome illustrates why "the Supreme Court has expressed doubts about 'the wisdom of' tribal immunity." *PCI Gaming Auth.*, 801 F.3d at 1287 (quoting *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 756-58 (1998)). Even so, "'the doctrine of tribal immunity is settled law and controls' unless and until Congress decides to limit tribal immunity." *Id.*

### 2. Sovereign immunity does not shield Stiffarm from the claim for injunctive relief in Count IV.

Stiffarm also lacks sovereign immunity from Plaintiffs' claim for injunctive relief, brought against him in his official capacity. Stiffarm says he is entitled to sovereign immunity from this claim because Plaintiffs only allege that Stiffarm "used his office to supervise the Tribe's lending program," but do not "allege any facts giving rise to his individual liability." Doc. 102 at 8. As a result, Stiffarm says, "Plaintiffs again improperly attempt to circumvent tribal sovereign immunity." *Id.* Not so.

The law is clear that "tribal officials may be subject to suit in federal court for violations of state law under the fiction of *Ex parte Young* when their conduct occurs outside of Indian lands." *PCI Gaming Auth.*, 801 F.3d at 1290; *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 796 (2014) (holding that "tribal immunity does not bar [*Ex parte Young*] suit[s] for injunctive relief against individuals, including tribal officers, responsible for unlawful conduct."); *see also Gingras v. Think Fin., Inc.*, 922 F.3d 112, 120 (2d Cir. 2019) (holding that "tribal sovereign immunity does not bar state . . . law claims for prospective, injunctive relief against tribal officials in their official capacities for conduct occurring off of the reservation").

Plaintiffs have pled that President Stiffarm—"in [his] official capacity"—continues to "supervise and direct [ANF's] lending activities" in Alabama. Doc. 95 at 23. The Court's "straightforward inquiry" ends here: because the Complaint

"alleges an ongoing violation of [state] law and seeks relief properly characterized as prospective," *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011), and because Stiffarm is "an officer of the" Tribe, he "is not protected by the tribe's immunity from" such a suit. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978); *Tamiami Partners By & Through Tamiami Dev. Corp. v. Miccosukee Tribe of Indians of Fla.*, 63 F.3d 1030, 1051 (11th Cir. 1995) (holding that "individual" tribal officers sued in their official capacity "are not shielded by the [t]ribe's sovereign immunity"). Accordingly, the Court will deny Stiffarm's Motion to Dismiss Count IV on sovereign immunity grounds.

### 3.  Stiffarm is not entitled to legislative or qualified immunity.

Stiffarm also claims he is entitled to either legislative or qualified immunity from Plaintiffs' ASLA and *Ex parte Young* claims. Neither argument carries the day.

First, Stiffarm may only assert qualified and legislative immunity as defenses to the *individual capacity* ASLA claim against him. *Lewis v. Clarke*, 581 U.S. 155, 163 (holding that "[d]efendants in an official-capacity action may assert sovereign immunity," while "[a]n officer in an individual-capacity action, on the other hand, may be able to assert personal immunity defenses"); *Braxton v. Stokes*, 2024 WL 2163637, at *4 n.4 (S.D. Ala.) (noting that legislative and qualified immunity are "available only in personal capacity actions").

Stiffarm makes the creative argument that he is entitled to legislative immunity because Tribe president is a legislative role, and "the institution and management of Tribal enterprises is delegated to the legislative branch by the [Tribe's] Constitution." Doc. 102 at 9. But even assuming that the management of ANF is a legislative act, Stiffarm's argument that he has legislative immunity fails.

It's true that "[t]he principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo–American law," and that legislative immunity extends to "state and regional legislators." *Bogan v. Scott-Harris*, 523 U.S. 44, 48 (1998). But no case in this circuit or any other has extended legislative immunity to *tribal* legislators, and even if one existed, Stiffarm has not shown that the management or direction of ANF is protected as an act "necessary to preserve the integrity of the legislative process." *Yeldell v. Cooper Green Hosp., Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992).

Stiffarm's claim to qualified immunity fares no better. Doc. 102 at 10-12. Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). But like his legislative immunity argument, Stiffarm has not identified—and this Court can find—no "authority that extends the protections of qualified immunity to tribal officials." *Easley v. Hummingbird Funds*,

2020 WL 5099955, at *3 n.6 (S.D. Ala.), *report and recommendation adopted as modified*, 2020 WL 5099941 (S.D. Ala.).

### C.    The Tribal Officer Defendants are not entitled to sovereign immunity from the Plaintiffs' claim for injunctive relief.

The Court need not consider whether the Tribal Officer Defendants are entitled to sovereign immunity from Plaintiffs' ASLA and conspiracy claims (Counts I and II), because the Court lacks personal jurisdiction. *See supra* Section III.B.2. The same is true for Plaintiffs' RICO claims against the Tribal Officer Defendants in Count V. *See supra* Section III.B.1.

That leaves only Count IV, which Plaintiffs bring against the Tribal Officer Defendants in their official capacities. In short, Plaintiffs allege in Count IV that the Tribal Officer Defendants "in their official capacity, supervise and direct [ANF's] lending activities" in violation of Alabama law. Doc. 95 at 23. Just like President Stiffarm, these "tribal officials" are "subject to suit in federal court for violations of state law under the fiction of *Ex parte Young*" because "their conduct occurs outside of Indian lands." *PCI Gaming Auth.*, 801 F.3d at 1290.

Finally, the Court notes that the named tribal officers may no longer be members of the Tribe's leadership, IMDG's board, or (in Evan Azure's case) CEO of ANF, given the pendency of this litigation. Although the parties have not notified the Court of any such changes, in the event tribal "officials sued in their official capacities leave office, their successors automatically assume their role in the

litigation." *Clarke*, 581 U.S. at 162 (holding that there is "no reason to depart" from the official capacity succession rule "in the context of tribal sovereign immunity.").

## IV.  STANDING

The Court next turns to Defendants' motions to dismiss the case for lack of standing.[10] Article III, § 2 of the U.S. Constitution confines the federal judicial power to "cases" and "controversies," and an "essential and unchanging part of the case-or-controversy requirement of Article III" is the requirement that a plaintiff have standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To satisfy the "irreducible constitutional minimum of standing," *id.*, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733 (2008).

And because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996), Plaintiffs are obligated "to demonstrate standing for each claim [they] seek[] to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). Accordingly, the Court will consider each claim Plaintiffs have brought against Defendants in turn.

---

[10] As noted earlier, the Court does not discuss the Plaintiffs' standing to bring the ASLA claim against ANF, which is entitled to tribal sovereign immunity. The Court also does not discuss Plaintiffs' standing to bring Counts I-III against the BorrowWorks Defendants, who did not challenge standing on those counts. As discussed throughout this opinion, Plaintiffs have adequately pled that they suffered a concrete injury, traceable to BorrowWorks Defendants (who supply ANF's operational infrastructure), and redressable by a favorable decision.

### A.     Count I: Alabama Small Loans Act

#### 1. Only Okrzesik has standing to bring an ASLA claim against President Stiffarm.

For purposes of Plaintiffs' standing to sue Stiffarm under ASLA, the primary question is which ASLA provisions are actionable. Plaintiffs argue that they have a cause of action for unlicensed lending, payments on unlicensed loans, and the retention of those payments; Stiffarm counters that ASLA claims are limited to the issuance of unlicensed loans above the legal interest rate. But because ASLA allows borrowers to recover actual economic damages resulting from an illegal loan, ASLA provides at least a cause of action for payments made on that loan. As a result, the Court will grant in part and deny in part President Stiffarm's motion to dismiss the ASLA claim for lack of standing. Doc. 101.

As a refresher, ASLA prohibits lenders from (1) issuing loans under $1,500 without a license, Ala. Code § 5-18-4(a), and (2) charging more than 24 percent interest on loans between $200 and $1,500. Ala. Code § 5-18-15(a). Plaintiffs have alleged that President Stiffarm violated ASLA when he "supervised and participated in" violations of ASLA, including the "collect[ion], rece[ption], and ret[ention] [of] principal and interest payments, as well as payments of other charges and fees, in connection with [those] loans to Plaintiffs." Doc. 95 at 21.

36

President Stiffarm argues that Plaintiffs' ASLA claim does not satisfy the traceability requirement for standing because he "did not hold office at the time Plaintiffs' loans originated, and [he] did not take any specific, individual action regarding Plaintiffs' loans." Doc. 102 at 4. In response, Plaintiffs argue that ASLA liability begins with loan origination but extends "as long as the loans are outstanding and subject to collection." Doc. 124 at 4. Neither side has it completely right.

First, Plaintiffs read ASLA too broadly. Their argument relies on an ASLA provision that "extinguishes the right to 'collect, receive, or retain' any money in connection with the unlicensed loans." *Id.* at 4 (quoting ALA. CODE § 5-18-4(d)). Plaintiffs' theory is that they have standing under that provision because Stiffarm was tribe president when (1) plaintiffs were making payments and (2) ANF was retaining those payments. And, Plaintiffs say, the harm is ongoing because ANF continues to retain the Plaintiffs' payments. But that argument is inapt because § 5-18-4(d) describes the criminal penalties for the misdemeanor of making small loans without a license, not a cognizable harm. *See* Ala. Code § 5-18-4(d) (providing that any person who violates subsections (a)-(c) "shall be guilty of a misdemeanor," and describing the penalties "upon conviction thereof"). That subsection cannot be reasonably read to create a cause of action for "collect[ing], receiv[ing], or retain[ing] any money in connection with unlicensed loans." *Id.*

But President Stiffarm reads ASLA too narrowly. No matter which remedy provision you look to, ASLA entitles borrowers to recover "the total amount of the actual economic damages" resulting from the illegal loan. § 5-18-15(l); *compare* Ala. Code § 5-18-21 (providing that "[e]xcept as set forth in subsection (l) of Section 5-18-15 . . . any licensee who fails to comply with any requirement imposed under this chapter with respect to any person is liable to the person for the actual damage sustained by the person as the result of the failure."). These references to "actual damages" resulting from an illegal loan extend the cause of action beyond mere loan origination and encompass payments on illegal loans as a valid cause of action.

The question, then, is whether Stiffarm was in office either (1) when ANF issued unlicensed loans between $200 and $1,500 to the Plaintiffs above 24 percent interest, or (2) when Plaintiffs made payments on such loans. Even taking the facts in the Complaint as true and construing them in Plaintiffs' favor, Weidley—but not Okrzsesik—lacks standing to bring an ASLA claim against Stiffarm because Stiffarm wasn't in office when Weidley took out the loan or made payments on it.

Weidley borrowed $700 from ANF "on or about November 5, 2020" and made payments until November 27, 2020. Doc. 130-1 at 1. Stiffarm was not even elected Tribe President until November 2021, so it is factually impossible for him to have participated in or overseen the issuance or collection of Weidley's loans. There's no such issue with Okrzesik, since the Complaint plausibly alleges that

Stiffarm was in office when she made payments on her second loan. Okrzesik took out her second loan on October 21, 2021, and made the last payment on November 12, 2021, after Stiffarm was elected. As already explained, *supra* Section III.A.2, it is plausible that Stiffarm was in office when Okrzesik made her last payment.

Stiffarm also says that it's not enough to merely "allege that he is a current officer of the Tribe with general supervisory authority over the loan program," since "the Tribe has no say in the direct, day-to-day business decision-making of IMDG," which runs ANF. Doc. 145 at 4-5. But jurisdictional discovery revealed that "ANF is exclusively operated by the Tribe," Doc. 114-2 at 20. Even if the *Tribal Council* appoints the IMDG Board—and thus "controls" ANF—that's not enough to overcome Plaintiffs' allegation that Stiffarm has some general supervisory control over ANF's lending operation as Tribe President.

Lastly, Stiffarm says that he's raised a *factual* "challenge [to] the existence of subject matter jurisdiction," which allows the Court to consider "matters outside the pleadings, such as testimony and affidavits." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). Pointing to the Tribe's Constitution, Stiffarm says, the Tribe's President is a legislative branch official who lacks "policy-making powers separate from his role as a member of the Tribe's legislative body." Doc. 102 at 4 (citing FBIC Const. Art. V § 1; Art. IV. §§ 1, 4). But Plaintiffs have alleged that Stiffarm "supervised and participated in" the issuance and collection of illegal loans and did

39

so in his individual capacity, Doc. 95 at 21, and the Tribe's constitutional structure does not make that allegation implausible.

For these reasons, the Court will dismiss Weidley's ASLA claim against Stiffarm for lack of subject matter jurisdiction, while Okrzesik's ASLA claim remains.

### B.    Count IV: *Ex parte Young* injunctive relief

Plaintiffs have standing to bring their claim for prospective injunctive relief against President Stiffarm and the Tribal Officer Defendants. In the context of an *Ex parte Young* claim, the bar for standing is higher than the bar for sovereign immunity. To skirt sovereign immunity in an official capacity claim, a plaintiff only needs to allege that an official "ha[s] some connection with the enforcement of the challenged law." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1256 (11th Cir. 2020) (citation omitted). Article III standing in an official capacity claim, on the other hand, "requires that the plaintiff's injury be 'fairly traceable' to the defendant's actions and redressable by relief against that defendant." *Id.*

Plaintiffs have cleared the bar for Article III standing because they "both borrowed money on terms which would violate [Alabama's] usury laws." *Gingras*, 2016 WL 2932163, at *7. As a result, "Plaintiffs' status as people alleging injury through violations of state law is not" in dispute. *Id.*

40

## C.     Count V: RICO

Although RICO gives standing to "[a]ny person injured in his business or property by reason of a [RICO] violation," 18 U.S.C. § 1964(c), it also imposes a proximate causation requirement on civil plaintiffs. A civil RICO plaintiff "only has standing if . . . [s]he has been injured in [her] business or property by the conduct constituting the violation," and that injury "flow[s] from the commission of the predicate acts." *Pelletier v. Zweifel*, 921 F.2d 1465, 1499 (11th Cir. 1991) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Put simply, "the central question . . . is whether the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).

The BorrowWorks Defendants say the RICO claim against them should be dismissed because they "merely provided technology services to [ANF]," a far cry from "directly" causing Plaintiffs' injuries. Doc. 117 at 29. But Plaintiffs have plausibly alleged BorrowWorks Defendants' "participation" in ANF's lending enterprise, which was the direct cause of their injuries. *See supra* Section III.C.

Indeed, it would be difficult to be more directly responsible for the injury caused by ANF's illegal loans than

> participat[ing] in the decisions on how to structure ANF, which loan documents to use, which states to lend into, what interest rates to charge, how to capitalize the lending operations, how to market into each state, how to divide the profits of the enterprise, how to mechanically deliver loan proceeds and collect payments, provide for the loans, collect the payments as well as decisions as to the size of the

41

loans, interest rates and the decision not to obtain licensing required by
Alabama law.

Doc. 95 at 23. As a result, Plaintiffs have standing to bring their RICO claim against

BorrowWorks Defendants.

## V.    FAILURE TO STATE A CLAIM, RULE 12(B)(6)

The Court next turns to Defendants' arguments that Plaintiffs have failed to
state an adequate claim for relief.[11]

The Federal Rules of Civil Procedure provide that a party may move to
dismiss a complaint that fails "to state a claim upon which relief can be granted."
FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint
must contain enough facts to state a facially plausible claim for relief. *Chaparro v.
Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (per curiam). To that end,
allegations "merely consistent" with a defendant's liability are not enough to push
"claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 570. When reviewing a motion to dismiss, the district court accepts a
complaint's factual assertions as true and construes those assertions in the light most
favorable to the pleader. *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246
(11th Cir. 2016).

---

[11] As stated earlier, the Court considered only the pleadings in deciding the Defendants Rule 12(b)(6). *See supra* p. 25
n.7.

### A.    Jeffrey Stiffarm

#### 1.  Okrzesik has adequately stated a claim against Stiffarm under the Alabama Small Loans Act.[12]

Stiffarm says that Plaintiffs have failed to state a claim because ASLA permits loans authorized by other states, and an Indian tribe is a state under Alabama law. ASLA provides that "[a]ny loans made outside [Alabama] in accordance with the law applicable to such loan in the state in which the loan was made may be collected in this state." ALA. CODE § 5-18-19. Stiffarm reads that statutory word salad to mean that ANF's loans do not violate ASLA—Alabama's consumer law includes federally-recognized Indian tribes in the definition of a "state," ALA. CODE § 8-1A-2, and "Plaintiffs' loan agreements" contain a choice-of-law provision which dictates that the agreements "are governed exclusively by the tribal laws of FBIC, a federally recognized Indian tribe." Doc. 102 at 15. As a result, Stiffarm says, ASLA permits the loans because they were lawful under the Tribe's laws.

That argument fails. Federal courts sitting in diversity are "required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." *O'Neal v. Kennamer*, 958 F.2d 1044, 1046 (11th Cir.1992). And under Alabama law, "the validity, interpretation, and construction of the contract . . . 'is governed by the laws of the state where it is made except where the parties have

---

[12] Because Weidley lacks standing to bring her ASLA claim against Stiffarm, the Court considers only Okrzesik's claims in its Rule 12(b)(6) analysis.

legally contracted with reference to the laws of another jurisdiction.'" *Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004) (quoting *Fitts v. Minnesota Mining & Mfg. Co.*, 581 So.2d 819, 820 (Ala. 1991)).

But "[w]hile parties normally are allowed to choose another state's laws to govern an agreement," Alabama does not give carte blanche to contracting parties when it comes to choice of law provisions. *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 507 (Ala. 1991). Instead, "where application of that other state's laws would be contrary to Alabama policy, the parties' choice of law will not be given effect and Alabama law will govern the agreement." *Id.*

That's no doubt the case here. The Alabama legislature has stated that ASLA is "necessary to protect the public welfare." ALA. CODE § 5-18-2(b) (emphasis added). To that end, the statute dictates that "[a]ny contract of loan . . . which violates this section shall be void, and the lender shall have no right to collect, receive, or retain any principal, interest, or charges whatsoever." ALA. CODE § 5-18-4(d). In that light, "unregulated usurious lending of low-dollar short-term loans at triple-digit interest rates to [Alabama] borrowers" is undoubtedly contrary to Alabama's public policy, and the parties' choice of tribal law cannot be given effect. *Hengle v. Treppa*, 19 F.4th 324, 352 (4th Cir. 2021). As a result, Alabama law applies, and the Plaintiffs have plausibly alleged that the loans were illegal under Alabama law.

On a related point, Stiffarm also says that Plaintiffs' claims should be dismissed because they are subject to the jurisdiction of a tribal court and Plaintiffs have failed to adequately exhaust their remedies in that forum. Doc. 102 at 14 (citing *Texaco, Inc. v. Zah*, 5 F.3d 1374, 1376 (10th Cir. 1993)). But "the sovereignty that the Indian tribes retain," and by extension the jurisdiction of tribal courts, "is of a unique and limited character. . . . [i]t centers on the land held by the tribe and on the tribal members within the reservation." *Plains Com. Bank v. Long Fam. Land & Cattle Co.*, 554 U.S. 316, 332 (2008) (citations omitted). Here, Plaintiffs are not members of the Tribe, and "have not engaged in *any* activities inside the reservation," including "apply[ing] for the loans, negotiat[ing] the loans, or execut[ing] loan documents." *Jackson v. Payday Fin.*, LLC, 764 F.3d 765, 782 (7th Cir. 2014). Instead, ANF marketed its loans to Plaintiffs in Alabama, and Plaintiffs applied for and made payments from Alabama. As a result, "the Plaintiffs' activities do not implicate the sovereignty of the tribe over its land and its concomitant authority to regulate the activity of nonmembers on that land, [and] the tribal courts do not have jurisdiction over the Plaintiffs' claims." *Id.*

### 2. Plaintiffs have adequately stated a claim for injunctive relief against Stiffarm in his official capacity.

As explained above, Plaintiffs have Plaintiffs have plausibly alleged that he has supervisory authority over an ongoing violation of state law, and therefore have

adequately stated a claim for injunctive relief against President Stiffarm in his official capacity. *PCI Gaming Auth.*, 801 F.3d at 1290.

### B.    Tribal Officer Defendants

The Tribal Officer Defendants have already demonstrated that the individual capacity claims against them (Counts I, II, & V) fail because those claims are factually impossible. *See supra* Section III.B.1.

As for the official capacity claim against the Tribal Officer Defendants, they argue that Plaintiffs have failed to state a claim because RICO does not provide for injunctive relief. But that argument fails because—with or without the RICO claim—Plaintiffs only needed to plausibly allege that the Tribal Officer Defendants are engaged in an ongoing violation of *state* law for their *Ex parte Young* claim to survive. For the reasons discussed in the preceding section, Plaintiffs have adequately stated a claim that the Tribal Officer Defendants (or their successors in office) are continuing to violate the Alabama Small Loans Act.

### C.    BorrowWorks Defendants

#### 1.    Plaintiffs have stated a claim against BorrowWorks Defendants under the Alabama Small Loans Act.

The BorrowWorks Defendants argue that Plaintiffs have failed to state a claim because (1) ASLA doesn't apply to them, and (2) ASLA doesn't provide for a private right of action. Neither argument is convincing.

On the first point, the BorrowWorks Defendants contend that § 5-18-4(a) only applies to those "engage[d] in the business of lending." That contention is easily dealt with—§ 5-18-4(a) also applies to "any person who seeks to evade its application by any device, subterfuge, or pretense whatsoever." ALA. CODE § 5-18-4(c). This includes, but is not limited to, "the real or pretended negotiation, arrangement, or procurement of a loan through any use of activity of a third person, whether real or fictitious." *Id.*

Plaintiffs have stated an adequate claim that the BorrowWorks Defendants have sought and are currently "seek[ing] to evade" ASLA through "device, subterfuge, or pretense." *Id.* For one, Plaintiffs say, "BorrowWorks Decision Science and BWDS, are each owned and controlled by Gatzke," and that "[t]hese entities, at Gatzke's direction, provide ANF's lending and underwriting platform," as well as "perform a great deal of the day-to-day activities of ANF." Doc. 95 at 9. This includes providing ANF's "website and internet support and marketing program." *Id.* at 11. And Plaintiffs claim that BorrowWorks Decision Science receives a substantial percentage of ANF's profits. *Id.* As a result, Plaintiffs have plausibly alleged that the BorrowWorks Defendants are full-fledged partners in the lending operation, not just service providers, and therefore that ASLA applies to them.

The BorrowWorks Defendant's second argument—that ASLA does not provide a cause of action—presents a more difficult question. Because there is a clearly expressed legislative intent to provide a remedy, however, the Court finds that ASLA does contain a valid private right of action.

First, "[b]ecause Plaintiff[s'] right of action is based on an Alabama statute, Alabama law will control whether [they have] a private right of action." *Abbott v. Elwood Staffing Servs., Inc.*, 2013 WL 12138588, at *2 (N.D. Ala.); *see also* 28 U.S.C. § 1652*; Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). But this Court cannot find—and the parties have not offered—a decision of any Alabama court explicitly recognizing that ASLA (in its current form) provides a cause of action. Given that, the Court must hazard its best "*Erie* guess" at "how the state's highest court would decide the issue." *Baldwin v. Express Oil Change*, LLC, 87 F.4th 1292, 1302 n.7 (11th Cir. 2023); *see Wolf v. Cigna Health & Life Ins. Co.*, 2024 WL 1908633, at *4 (S.D. Fla.) (cleaned up) (holding that federal courts must "proceed gingerly when venturing into uncharted waters of state substantive law," because "it is not the function of federal courts to expand state tort doctrine in novel directions absent state authority suggesting the propriety of doing so").

48

The Alabama Supreme Court has held that "[w]ords used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says." *IMED Corp. v. Sys. Engin. Assoc. Corp.*, 602 So. 2d 344, 346 (Ala. 1992). And unambiguous language in a statute leaves "no room for judicial construction." *Id.* Beyond that, plaintiffs "claiming a private right of action within a statutory scheme must show clear evidence of a legislative intent to impose civil liability for a violation of the statute." *Century Tel of Alabama, LLC v. Dothan/Houston Cnty. Commc'ns Dist.*, 197 So. 3d 456, 463 (Ala. 2015) (citation and internal quotation marks omitted).

ASLA's text does not unambiguously provide a cause of action. Still, the Alabama Supreme Court *has* held that ASLA "is a remedial statute . . . and should be liberally construed to effect its purpose and to advance the remedy for which it was enacted." *Austin v. Alabama Check Cashers Ass'n*, 936 So. 2d 1014, 1026 (Ala. 2005). And in the arbitration context, that Court has considered multiple cases arising under ASLA in recent years without invalidating the underlying ASLA claims. *See, e.g.*, *Alabama Catalog Sales v. Harris*, 794 So. 2d 312, 317 (Ala. 2000), *abrogated on other grounds by Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006) (affirming denial of motion to compel arbitration where the "record contains substantial evidence indicating that the underlying contracts violate the

Alabama Small Loan Act."); *CNU of Alabama, LLC v. Shakeena Cox*, 2024 WL 4716159, at *3 (Ala.) (holding that whether a loan agreement "is governed by either the Small Loan Act or the Alabama Consumer Credit Act . . . is for an arbitrator to decide").

Finally, although legislative silence is not dispositive, the Court notes that the substantively identical Alabama Consumer Credit Act expressly states that "[n]o private cause of action exists against a creditor for failing to obtain a license required by Section 5-19-22." ALA. CODE § 5-19-19. The fact that the legislature has not added a similar provision to ASLA speaks volumes. As a result, the Court finds that ASLA's text contains a valid cause of action at least for the recovery of "the total amount of the actual economic damages" resulting from an illegal loan. *See supra* IV.A.1.

### 2. Plaintiffs have pled a plausible conspiracy claim against BorrowWorks Defendants.

Plaintiffs have also adequately pled the conspiracy claim in Count II. To survive a motion to dismiss a civil conspiracy claim under Alabama law, a plaintiff must satisfy two requirements. First, because "[c]ivil conspiracy is not an independent cause of action; there must be an underlying wrong on which the conspiracy claim is based." *Nance v. Maxwell Fed. Credit Union (MAX)*, 186 F.3d 1338, 1342 (11th Cir. 1999). So far, so good—Plaintiffs have already established the underlying wrong of an ASLA violation.

50

Second, "a claim for conspiracy requires that there 'must . . . be concerted action between two or more persons.'" *Southland Health Servs., Inc. v. Bank of Vernon*, 887 F. Supp. 2d 1158, 1180 (N.D. Ala. 2012) (quoting *AmSouth Bank, N.A. v. Spigener,* 505 So.2d 1030, 1040 (Ala.1986)). That means "the plaintiff must plead with particularity 'the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy.'" *Ex parte United Ins. Companies, Inc.*, 936 So. 2d 1049, 1055 (Ala. 2006) (citation omitted). Plaintiffs have done so here—they allege that the BorrowWorks Defendants, in concert with the Tribal Officer Defendants, "agreed to offer illegal loans in Alabama, and to set high interest rates for those loans," and that "[e]ach [named] Defendant actively participated in the operations of ANF as alleged above, and . . . had a supervisory role over the tribe's businesses including, but not limited to, its illegal lending operations." Doc. 95 at 21-22.

### 3. Plaintiffs have failed to state an unjust enrichment claim against BorrowWorks Defendants.

Plaintiffs have failed to state claim for unjust enrichment because the Alabama Supreme Court has rejected the proposition that a statute authorizing the recovery of "actual damages" justifies an action for "unjust enrichment." *Ex parte Alfa Fin. Corp.*, 762 So. 2d. 850, 854. In *Ex parte Alfa*, Plaintiffs sued Alfa to recover interest paid on an illegal loan, arising under a statute containing language identical to ASLA's: the Alabama Consumer Credit Act governing consumer finance. *Id.* at 853. The statute prohibited creditors from "engag[ing] in the business of making

consumer loans . . . without first having obtained a license for each location in Alabama." *Id.* at 851 (quoting ALA. CODE § 5-19-22(a) (1975)). The same statute provided that:

> [e]xcept where other specific remedies are provided in this chapter for violations of specific provisions of this chapter in which event such remedies shall apply, any provision of a consumer credit transaction which violates the provisions of this chapter shall be unenforceable by the creditor to the extent, but only to the extent, of such violation, and the other remaining provisions and agreements shall not be affected by such violation. Any creditor who fails to comply with any requirement imposed under this chapter with respect to any person is liable to such person for the actual damage sustained by such person as a result of the failure.

*Id.* (quoting ALA. CODE § 5-19-11(b) (1990)).[13]

The plaintiffs argued that the statute's reference to "actual damage" meant "unjust enrichment," or "all of the interest paid to the unlicensed creditor." *Id.* at 854. The court rejected that theory, holding instead that that courts must "focus on the consumer/debtor's loss, not on the creditor's gain." *Id.* at 853-54. As a result, the term "actual damage" allows a consumer finance plaintiff to recover "the difference between the amount of interest actually paid to an unlicensed creditor and some

---

[13] *Cf.* ALA. CODE § 5-18-21: "Except where other specific remedies are provided in this chapter for violations, in which event those remedies shall apply, any provision of a loan contract which violates this chapter shall be unenforceable by the licensee to the extent, but only to the extent, of the violation, and the other remaining provisions and agreements shall be enforceable and shall not be void and shall not be affected by the violation. Except as set forth in subsection (l) of Section 5-18-15, any licensee who fails to comply with any requirement imposed under this chapter with respect to any person is liable to the person for the actual damage sustained by the person as the result of the failure."

lower amount of interest that could have been paid to a licensed creditor, and any other actual out-of-pocket expense incurred by the consumer/debtor resulting from the creditor's failure to be licensed." *Id.* at 854.

The same reasoning applies here. Plaintiffs allege that the BorrowWorks Defendants "wrongfully collected and retained funds which, in equity and good conscience, belong to Plaintiffs" in violation of ASLA. Doc. 95 at 22. But like Alabama's consumer credit statute, ASLA provides only for the recovery of "actual damage" sustained because of a violation, Ala. Code § 5-18-21. Because the Alabama Supreme Court has said that "actual damage" means "difference in interest," not "unjust enrichment," Plaintiffs have not adequately pled a claim for unjust enrichment, and the Court will dismiss Count III. *Id.* at 854.

### 4. Plaintiffs have stated a plausible RICO claim against BorrowWorks Defendants.

As already discussed for purposes of personal jurisdiction, *supra* Section III.B, Plaintiffs' RICO claim against the BorrowWorks Defendants survives a 12(b)(6) analysis.

## VI.    FAILURE TO JOIN A NECESSARY PARTY

Finally, Defendants argue that the case should be dismissed because the Tribe itself is a "necessary party" that cannot be joined. *See, e.g.*, Doc. 102 at 16. That

argument fails because the Tribe's interests are adequately represented by the Tribal Officer Defendants.

The Federal Rules of Civil Procedure require that "[c]ertain entities whose rights or obligations are implicated by a particular suit must be joined to that litigation if feasible." *Muscogee (Creek) Nation v. Poarch Band of Creek Indians*, 525 F. Supp. 3d 1359, 1368 (M.D. Ala. 2021), *vacated and remanded on other grounds sub nom. Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881 (11th Cir. 2024). Practically speaking, the Tribe is a "required party" if "the court cannot accord complete relief" in its absence or if going forward without the Tribe would "impair or impede the person's ability to protect the [Tribe's] interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1). Furthermore, the general rule is that "[a] case may not proceed when a required-entity sovereign is not amenable to suit . . . where sovereign immunity is asserted, and the claims of the sovereign are not frivolous, dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." *Fla. Wildlife Fed'n Inc. v. United States Army Corps of Engineers*, 859 F.3d 1306, 1320 (11th Cir. 2017) (quoting *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008)).

At first glance, Plaintiffs appear to have a serious Rule 19 problem. As ANF points out, the Tribe has a significant interest in this litigation because the Plaintiffs' "overarching objective . . . is to force the Tribe to shutter [its] online consumer lending business." Doc. 103 at 28. And despite that significant interest, the Tribe is no doubt entitled to sovereign immunity from all the claims here, so joinder is impossible.

That might doom Plaintiffs' claim under Rule 19, save the fact that this case is—in part—an official capacity claim against tribal officials. In that context, "basic *Ex parte Young* principles" dictate that "a tribe is not a required party under Rule 19." *Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 930 (D.C. Cir. 2012) (collecting cases). Because the Tribe, Stiffarm, and the Tribal Officer Defendants "are one and the same in an *Ex parte Young* suit for declaratory and injunctive relief," those Defendants "can adequately represent the [Tribe] in this suit, meaning that the [Tribe] itself is not a required party for purposes of Rule 19." *Id.* at 929-30. For that reason, the Court will deny the Defendants' motions to dismiss for failure to join a necessary party.

## VII.  CONCLUSION

For all these reasons, the Court **GRANTS IN PART** Jeffrey Stiffarm's Motion to Dismiss, Doc. 101; **GRANTS IN PART** the BorrowWorks Defendants' Motion to Dismiss, Doc. 104; **GRANTS** Aaniiih Nakoda Finance's Motion to

Dismiss, Doc. 106; and **GRANTS IN PART** the Tribal Officer Defendants' Motion to Dismiss, Doc. 107. As a result,

> ➢ Count I is dismissed as to ANF and the Tribal Officer Defendants, and Weidley's Count I claim is **DISMISSED**;

> ➢ Count II is dismissed as to ANF and the Tribal Officer Defendants, and Weidley's Count II claim is **DISMISSED**;

> ➢ Count III is **DISMISSED** in its entirety;

> ➢ Count V is **DISMISSED** as to Stiffarm and the Tribal Officer Defendants.

**DONE** and **ORDERED** this May 28, 2025.

_____

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE